IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RANDY L. GREENE | * | |
| | * | |
| v. | * | Civil No. JFM-04-1700 |
| | * | |
| A. DUIE PYLE, INC. | * | |
| | * | |
| ***** | | |

OPINION

In June 2004, Plaintiff Randy L. Greene ("Greene") filed a two-count complaint alleging that Defendant A. Duie Pyle, Inc. ("Pyle") tolerated a sexually offensive work environment and retaliated against Greene in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq. Both Greene and Pyle have filed motions for summary judgment which are presently pending before this Court. For the reasons stated below, Greene's motion will be denied and Pyle's motion will be granted.

I.

Greene began employment as a truck driver with Pyle in March 2001. After an initial period of training, he worked regularly at the Pyle terminal in York, Pennsylvania from July 2001 until April 2002. Greene was terminated on April 25, 2002. (Compl. ¶ 4.)

Greene alleges that he was subjected to various inappropriate materials and comments that created a hostile work environment. In particular, Greene says that he (1) observed a *Penthouse* magazine and a *Playboy* magazine in the cafeteria, (2) observed a *Playboy* magazine in the men's restroom, and (3) observed at least fifteen offensive faxes, cartoons, or emails, about half of which

-1-

were observed near the public time clock. (Greene Dep. at 86:20-89:19.) Greene says that he did not keep copies of any of these items, but threw them away when he observed them. Additionally, Greene saw a joke list taped to the wall near the time clock on April 25, 2002. (*Id.* at 148:12-150:15.) The joke list was printed from an email account and titled "FOR MEN TIRED OF RECEIVING MALE-BASHING JOKES." The list contains several questionable jokes playing on gender stereotypes, e.g., Q: "How many men does it take to open a beer?"; A: "None. It should be opened by the time she brings it."

The record reflects three instances when Greene reported the existence of materials or comments that he believed to be inappropriate in the workplace to management at Pyle. First, in February 2002, Greene reported to Eric McVeigh, the manager of the York terminal, that Gene Hart, another employee, had told an "off-color" joke. (McVeigh Dep. at 56:6-10.)

Approximately three months later, on April 5, 2002, Greene went to Tom Chambers, Pyle's Human Resources Director, to express his discomfort with materials in the York terminal that he found offensive. Chambers indicated that nothing of the nature Greene described should be in the office and that such material was not condoned by Pyle. (Greene Dep. at 112:7-115:5.) Chambers and Greene also discussed Greene's complaints about his routes and work schedule. (*Id.* at 108:8-10; 116:15-118:5.)

Following the meeting with Chambers, Greene ran a route out of the York terminal. When Greene returned to the terminal, McVeigh called Greene into his office and started a conversation with him. Greene alleges that McVeigh angrily told him that there was no problem, but that, nonetheless, McVeigh would discuss the issue with anyone who was bringing magazines or other materials into the

terminal. McVeigh also asked that Greene bring to his attention anything offensive that was found in the terminal. (*Id.* at 124:1-125:18.)

From April 5 until April 25, Greene did not find any inappropriate material in the terminal. On April 25, Greene found the above-mentioned joke list taped near the time clock. (*Id.* at 148:12-149:4.) Greene took the list to McVeigh. Greene alleges that McVeigh did not believe that the joke list was inappropriate and that McVeigh said that Greene was "just trying to cause . . . trouble." (*Id.* at 151:18-19.) At that point, McVeigh terminated Greene. (*Id.* at 151:8-152:17) Later that day, Greene went to see Chambers. Greene told Chambers that he believed he had been fired because he showed McVeigh the joke list. McVeigh and Chambers maintain that Greene was terminated because he was argumentative.

No other Pyle employee reported seeing *Penthouse* or *Playboy* magazines at any Pyle location. (Keim Dep. at 12:11-13:12; Wood Dep. at 16:13-20; Byerly Dep. at 27:1-16.) Jeffrey Wood, another Pyle driver, did report that he saw *FHM* and *Maxim* magazines in the terminal. (Wood Dep. at 16:13-17; *see also* Pl.'s Appendix, Exs. 10 & 11 (examples of *FHM* and *Maxim* magazines).) He also reported that explicit jokes were told in the terminal, but many of these were of a political, rather than purely prurient, nature. (*Id.* at 17:17-18:5; *see also* Byerly Dep. at 27:17-21.) Wood also stated that Pyle employees, including McVeigh, would make inappropriate sexual comments about other, particularly female, employees. (Wood Dep. at 19:19-21:21.) Discovery has not revealed that any other employee complained about the allegedly sexually-charged nature of the Pyle facility in York.

All Pyle employees are subject to a sexual harassment policy that protects third parties by prohibiting the offensive "sexual conduct or communications of others." (Opp'n Mot. Summ. J. at 3.)

Pyle maintains an "open-door" policy to encourage communication between managers and employees regarding these issues. (*Id.*)

II.

A.  Hostile Work Environment

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "When [a] workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). To state a prima facie case of sexual harassment based on an abusive or hostile work environment, a plaintiff must show (1) that [s]he was harassed because of [her] sex, (2) that the harassment was unwelcome, (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (citing *Wrightson v. Pizza Hut of Am.*, 99 F.3d 138, 142 (4th Cir. 1996)). The offensiveness of the work environment is evaluated from both the subjective standpoint of the plaintiff and from the objective standpoint of a reasonable person in the plaintiff's position. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether the environment was hostile, factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work environment." *Id.*

at 788 (citing *Harris*, 510 U.S. at 23). The standards for judging hostility are such that complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are filtered out so that Title VII does not become a "general civility code." *Faragher*, 524 U.S. at 788 (citations omitted).

The presence of pornography in a work place can be one factor courts may consider as part of a hostile work environment claim. *See, e.g., Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (actionable sexual harassment may include exposure to pornographic pictures); *see also Moore v. Met. Water Reclamation Dist. of Greater Chicago*, No. 02-C-4040, 2004 WL 2898042, at *1 n.1 (N.D. Ill. Dec. 13, 2004) (citing examples). In *Robinson v. Jacksonville Shipyards, Inc.*, 769 F. Supp. 1486 (M.D. Fla. 1991), a female welder was one of only a handful of female employees working in a large shipyard. The findings of fact in the case bare out that graphic pornography was constantly and pervasively displayed at the shipyard. *Id.* at 1495-98. Indeed, witnesses testified that the pervasiveness of the pictures left them unable to recount each example. *Id.* at 1495. Moreover, in *Robinson*, the display of pornography was coupled with repeated lewd and offensive statements made to the plaintiff about both the pornography and the plaintiff herself. *Id.* at 1497. In short, the environment described by the *Robinson* plaintiff was just the type of "hellish" workplace against which Title VII was enacted to protect. *See Baskerville*, 50 F.3d at 430.

In contrast, during Greene's employment, he alleges that he observed magazines that reasonable people might agree were objectively offensive on only three occasions. Photos from the magazines were not posted on the wall as in *Robinson*. Unlike in *Robinson*, there is no evidence that the magazines at the Pyle terminal were a constant or even common subject of conversation. Greene

also alleges that he saw "at least fifteen" faxes and emails that he found offensive. (Greene Dep. at 89:1-19.) Greene does not recall the content of most of these documents, though he does recall a drawing of an old man with his penis attached to a guillotine and a naked woman. (*Id.* at 89:11-19.) Reasonable people likely would also find this particular drawing objectively offensive. Finally, Greene alleges that he saw the joke list that prompted him to meet with McVeigh. While reasonable people would agree that the jokes are in poor taste, they are not objectively offensive. Employees testified that they saw *Maxim, FHM*, and *Stuff* magazines in the terminal. Like the joke list, these magazines strain the limits of good taste, but reasonable people could not find that the sporadic observation of such magazines objectively offensive.

      Greene also alleges that he heard supervisors at Pyle make comments about female employees. Again, there is no doubt that sexually suggestive or insulting comments can support a claim of a hostile work environment, *e.g., Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325 (4th Cir. 2003), but the comments must meet the standard of objective severity and pervasiveness. In *Ocheltree*, the plaintiff was subjected to "a daily stream of discussion and conduct that was sex-based or sexist." *Id.* at 328. Conversely, Greene has only produced evidence tending to show that "from time to time" employees and supervisors in the shop made sexually suggestive comments about female employees. (Wood Dep. at 20:13-21.)

      Greene's allegations, even if accepted as true, do not describe the requisite severity or pervasiveness necessary to create a hostile work environment. The workplace Greene describes, though crude, is not the hellish environment against which Title VII protects. Over the course of Greene's seven month tenure with Pyle, he can point to only a few examples of objectively

unreasonable conduct. Moreover, none of these instances were accompanied by aggravating factors such as a public audience for his embarrassment, extended discussion of the inappropriate materials by other workers, or physical threats or humiliation.

B. Retaliation

To establish a prima facie case of retaliation under Title VII, Greene must show (1) that he engaged in protected activity, (2) that an adverse employment action was taken against him, and (3) that there was a causal link between the protected activity and the adverse employment action. *E.g., Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004) (citing *Laughlin v. Metro. Washington Airports*, 149 F.3d 253, 258 (4th Cir. 1998)). There is no debate that there was an adverse employment action, i.e., Greene's termination. Likewise, the evidence is clearly sufficient to establish a causal link between Greene's activity and his termination. The only question is whether Greene engaged in protected activity. To answer this question, this court must determine whether Greene subjectively (in good faith) believed that Pyle was violating Title VII and whether Greene's subjective belief was objectively reasonable in light of the facts. *See Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003) (citing *Weeks v. Harding Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002)). If Greene held a reasonable belief, he may maintain his retaliation claim even though he cannot maintain a claim for hostile work environment. *Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 689 n.11 (W.D. Ky. 2003) (citing *Peters*, 327 F.3d at 320-21).

The parties disagree both about whether Greene subjectively believed that Title VII was being violated and about whether this subjective belief was objectively reasonable in light of all the surrounding facts. While Greene may have met his burden of producing some evidence supporting his

-7-

subjective belief, I find that analysis of his subjective belief is unnecessary because his beliefs were not objectively reasonable. Greene's testimony can be distilled to a handful of observations of lewd magazines as well as occasional receipt or observation of inappropriate jokes or drawings over the course of seven months of employment at a trucking terminal. The "constellation" of factors that must be considered in evaluating a Title VII claim requires more offensive conduct to create a reasonably objective belief that a workplace meets the severe and pervasive standard. In particular, the complaint that led directly to Pyle's retaliatory conduct was just the type of gender-related joking that the Supreme Court has held that Title VII was not designed to reach. *See Faragher,* 524 U.S. at 788. Accordingly, Defendant's motion for summary judgment on Greene's retaliation claim will be granted.

      A separate order follows.

<u>May 31, 2005</u>                                          <u>/s/                          </u>
Date                                                     J. Frederick Motz
                                                         United States District Judge